IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

TIFFANY A. MARSHALL,　　　　*
　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　*
　　　　　　　　　　　　　　*
　　　　v.　　　　　　　　　*　　　CV 408-024
　　　　　　　　　　　　　　*
MAYOR AND ALDERMAN OF　　　*
CITY OF SAVANNAH,　　　　　*
GEORGIA and CHARLES G.　　 *
MIDDLETON, CHIEF, CITY　　 *
OF SAVANNAH FIRE　　　　　 *
DEPARTMENT, individually　*
and in his official　　　　*
capacity,　　　　　　　　　*
　　　　　　　　　　　　　　*
　　　　Defendants.　　　　 *

———————

O R D E R

———————

This matter comes before the Court pursuant to Defendants' Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c). (Doc. no. 32.) Upon consideration of the record evidence, the briefs submitted by counsel, and the relevant law, Defendants' motion is **GRANTED** for the reasons stated below.

## I.   BACKGROUND

Plaintiff Tiffany A. Marshall brings claims under 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1983 ("§ 1983") against Defendants Mayor and Alderman of the City of Savannah, Georgia and Chief Charles G. Middleton, Fire Chief of the City of Savannah Fire and Emergency Services, in his official capacity.[1] Plaintiff was hired by the City of Savannah Fire and Emergency Services ("Savannah Fire") as a firefighter trainee on September 18, 2006. (Pl. Dep. at 17.) Plaintiff's employment was to be on a probationary basis for a full year from her start date. (Id. at 18.)

### A.   Plaintiff's MySpace Page

Plaintiff created a personal account on www.myspace.com ("MySpace") prior to her employment with Savannah Fire. (Id. at 21.) MySpace allows people such as Plaintiff to create personal web pages for free. (Id.) MySpace allows for varying levels of privacy restrictions for these personal pages. (Id. at 21-22.) Plaintiff alleges that since September 2006, her MySpace account had been set to private, meaning that only people whom she

---

[1] In her original complaint, Plaintiff sued Charles G. Middleton both in his individual and official capacities. (Doc. no. 1.) However, the Court ordered that Middleton be dismissed as a party defendant in his individual capacity. (Doc. no. 25.) Thus, Plaintiff's arguments as to qualified immunity are misplaced. See Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

accepted as "friends" could view her MySpace page. (Id.)
Plaintiff set her account to private so that "only people
[she] knew could access [her] information." (Id. at 23.)
Plaintiff admits that she did not post any items on her
page which she felt were of "news interest" or of "public
concern." (Id. at 24.)

Plaintiff posted several photographs of herself of
both a personal and a professional nature. First,
Plaintiff posted a photograph of several firefighters,
including her, that were employees of Savannah Fire. (Id.
at 29; Ex. 1.) Plaintiff obtained this photograph from the
City of Savannah website. (Pl. Dep. at 29.) Plaintiff
labeled this photograph "Diversity." (Id.; Ex. 1.) This
photograph belonged to the City of Savannah. (Stanley Dep.
at 15-16.) Captain Matthew Stanley, the public information
director at Savannah Fire, explained that this photograph
was posted on the City of Savannah website as the "official
recruitment photograph" in order to demonstrate Savannah
Fire's efforts in promoting diversity. (Id.)

In addition, Plaintiff posted a link to video of an
earlier class of Savannah Fire recruits as well as a
photograph of the Georgia Search and Rescue Coastal Task
Force ("GSAR"). (Pl. Dep. at 31, 35; Ex.1) Plaintiff
admits that she did not ask permission before posting these

3

photographs and video. (Id. at 35.)   Plaintiff explains
that she posted these pictures because she was "proud of
her job." (Id. at 37.)

Next to the photograph labeled "Diversity," Plaintiff
posted two of her modeling photos. (Id., Ex. 1.)  In the
first photograph, Plaintiff is wearing only a white towel.
The photograph is captioned "Fresh out of the shower."
(Id.)   The next photograph depicts Plaintiff in minimal, if
any clothing.[2]  This photograph is captioned "I model too -
this is from like [sic] my second shoot!" (Id.)

### B.   Savannah Fire's Discovery of Plaintiff's MySpace Page

At some point in February 2007, Captain Stanley
received a call forwarded from his desk on his way from
work. (Stanley Dep. at 24.)   The caller informed Captain
Stanley that he had seen some of Savannah Fire
firefighter's personal websites and he believed that some
of the images "conflicted" with the way Savannah Fire would
want to be portrayed. (Id.)   The caller did not give his
name or discuss where he had learned of this information,
but specifically referenced Plaintiff's MySpace page. (Id.
at 28.)

---

[2] Due to the poor quality of the printed picture, the Court is unable to
determine the nature of Plaintiff's clothing.

The next morning, Captain Stanley notified his superior officers about the call. (Id. at 35.) Captain Stanley logged into his own personal MySpace account and searched for Plaintiff's page. (Id. at 43.) Captain Stanley recalls that it took about five minutes to locate Plaintiff's page and that he was able to access the entirety of her page. (Id.) Thus, Captain Stanley was able to view all of her photographs. Captain Stanley recognized the "Diversity" photograph as the official recruitment photograph of Savannah Fire. (Id. at 15-16.) When her page was displayed, Captain Stanley printed the screen image and delivered the pages to his superior officers, Chief Middleton and Captain Butler. (Id.)

Chief Middleton explains that at Savannah Fire, "[they] work at having a positive image, and [they] want to be viewed as a professional, competent department with outstanding members. [They] don't want to be viewed as the fire department with female firefighters wrapped in towels." (Middle Aff. ¶ 3.) Chief Middleton was concerned about the placement of Plaintiff's modeling photographs next to images of Savannah Fire firefighters. (Id.) In his opinion, Plaintiff was "using her notoriety as a Savannah Fire Firefighter to promote herself as a model for other personal publicity reasons." (Id.) Chief Middleton felt

these photos conflicted with the professional image of Savannah Fire. (Id.) Chief Middleton directed Assistant Chief of Operations Stephen Bragg to investigate further into the matter. (Bragg Dep. at 78.)

Asst. Chief Bragg discussed Plaintiff's MySpace photo page with a Human Resources representative, as well as Plaintiff's Battalion Commander, Stanley Mosley. (Id. at 21-24.) Asst. Chief Bragg decided to give Plaintiff an oral reprimand, the lowest level of discipline. (Id. at 24.) The written documentation of the oral reprimand indicates that Plaintiff received the reprimand for "violation of city policy" and by "bringing discredit to the Fire Bureau." (Pl. Dep., Ex. 3.) The oral reprimand documentation cited Savannah Fire's Rules and Regulations regarding "Department Representation/Conflict of Interest" and "Unbecoming Conduct." Specifically, Section 13.30 prohibits employees from "using their positions within the Department to enhance or promote any private enterprise, or to seek personal publicity." (Pl. Dep., Ex 4.) Section 13.25 prohibits "actions which bring the Department into disrepute or reflects discredit upon the employee as a member of the Department." (Id.)

In response to the complaint about Plaintiff's website, Savannah Fire issued General Order 07.012 to

notify "other people that might have been involved in this situation or . . . similar type situations." (Bragg Dep. at 26.)  This order provided that Savannah Fire employees were not to use department-owned images for any unauthorized use, whether personal or professional. (Stanley Dep. at 47.)   This order, dated February 28, 2007, gave firefighters until March 7, 2007 to comply with its requirements without repercussions. (Bragg Dep. at 25-29.)

C.    **March 2, 2007 Meeting with Plaintiff and Subsequent Termination**

Chief Middleton, Asst. Chief Bragg, and Battalion Chief Mosley met with Plaintiff on March 2, 2007 regarding her MySpace page.  Chief Middleton showed Plaintiff a copy of the print-outs from her MySpace page and told her that she was in direct violation of Savannah Fire policy. (Pl. Dep. at 43.)  Chief Middleton explained that she did not have permission to post pictures that showed department personnel in gear or uniform.  (Id. at 47.)  Chief Middleton provided her with a copy of Savannah Fire's Rules and Regulations and informed her that she was in violation of Sections 13.25 and 13.30. (Id. at 49.)  Plaintiff did not feel that she was in violation of either of these regulations. (Id. at 49-50.) Chief Middleton told her that "things we sometimes do as young people that we later on

regret . . . may have an effect on our careers in the future or in life in general." (Id. at 41-43.)

Chief Middleton told Plaintiff that she would receive an oral reprimand and that such a reprimand was the lowest level of disciplinary actions that could have been taken. (Id. at 48.)   Chief Bragg told Plaintiff that she had to remove both photographs depicting Savannah Fire personnel. (Id. at 59.)    While Plaintiff agreed to remove the photograph captioned "Diversity," she refused to remove the GSAR photo. (Id. at 56.) Chief Middleton explained to her that she had been given a direct order and needed to follow that order. (Id. at 59-60.) Plaintiff notes that removing the photo was not discussed again.

At that point, Chief Middleton handed her the written documentation of the Oral Reprimand and asked her to read and sign it. (Id. at 60.)   Plaintiff explained that she did not feel comfortable signing the statement.    (Id.) Asst. Chief Bragg then "rudely" interrupted her explanation and Plaintiff said "sir, I will not be talked to like that." (Id. at 61.)

Plaintiff eventually agreed to sign the Oral Reprimand. (Bragg Dep. at 55.)  Plaintiff then asked Chief Middleton if he would shred the MySpace pictures of her. (Pl. Dep. at 65.) She also asked for a copy of the

8

photographs.  (Id.)  Chief Middleton told her at the end of the meeting that it was not the end of the world and that he hoped she would take this opportunity to prove that she was not "this person." (Id.)

Toward the conclusion of the meeting, Plaintiff explained to Chief Middleton that she felt that she was being singled out because she was not the only firefighter with a MySpace page that displayed fire department related photographs. (Id. at 66.)  Chief Middleton told Plaintiff that he was unaware of any other such pages and asked her to identify other firefighters with similar pages or photograhs. (Id.)  Plaintiff refused to give him any names and told Chief Middleton that "he could look for them just the same as [she] was looked for." (Id. at 67.)

In Plaintiff's view, she was "calm, careful and respectful" during this meeting. (Pl. Br. at 5.)  Plaintiff testifies that she did not raise her voice at any time. (Pl. Dep. at 69.) She further claims that she was not angry, but merely upset. (Id.)

Asst. Chief Bragg and Chief Middleton dispute Plaintiff's recollection of her attitude during the meeting.  Chief Middleton recalls that she went from being defensive to combative. (Middleton Aff. ¶ 5.)  Chief Middleton specifically recalls that "her combative tone,

9

the sharpness of her words, and her disregard for [his] authority, [he] had never experienced with a subordinate to this extent during his thirty-three years of fire service." (Id.)   Likewise, Asst. Chief Bragg recalls that Plaintiff "really got out of control" when they showed her the MySpace pictures.   (Bragg Dep. at 48.)   He further recalls that she pointed her finger at him and said "you did it." (Id. at 62.) Asst. Chief Bragg believed that Plaintiff was insubordinate in failing to address him properly because the Plaintiff referred to him as "the gentleman on my left." (Id. at 62; Pl. Dep. at 53-54.)

After Plaintiff left the meeting, Asst. Chief Bragg told Chief Middleton that the meeting had been a "really bad situation." (Bragg Dep. at 57.)   Asst. Chief Bragg decided to terminate Plaintiff for cause and probation violations.   On March 5, 2007, Asst. Chief Bragg wrote to Chief Middleton, stating:

> After further review and discussions I have decided due to the unpleasant discipline procedure process and attitude of [Plaintiff] to dismiss her from employment.   Her self denial of violation of Fire Department policy, disrespect toward administration and Chief Officers, disregard for oath of a Savannah Firefighter. [sic]

(Bragg Dep., Ex. 1.)    Asst. Chief Bragg then informed Battalion Chief Mosely about his decision to terminate Plaintiff.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 8, 2007, claiming discrimination based on sex and retaliation.  On April 17, 2008, Plaintiff filed an Amended Complaint alleging claims of racial and gender discrimination under Title VII and § 1983 as well as a First Amendment retaliation claim.[3]

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues of fact and the movant is entitled to summary judgment as a matter of law.   Fed. R. Civ. P. 56(c).   The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).   In considering a motion for summary judgment, all facts and reasonable inferences are to be

---

[3] As will be discussed, Plaintiff cannot sustain a Title VII retaliation claim because she did not plead one in her complaint.  Further, she cannot sustain a Title VII racial discrimination claim because her EEOC Charge of Discrimination did not contain a claim for racial discrimination.

construed in favor of the nonmoving party.  Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004).  The party opposed to the summary judgment motion, however, "may not rest upon the mere allegations or denials in its pleadings.  Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial."  Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In response to Defendants' motion for summary judgment, the Clerk issued a Griffith[4] notice on November 17, 2008.  (Doc. no. 35.)

## III. **DISCUSSION**

### A.   **Title VII Disparate Treatment Claim**

i.    *McDonnell Douglas Framework*

The Court first considers Plaintiff's discrimination claim under Title VII and § 1983.[5]   Title VII makes it

---

[4] Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam).

[5] Title VII discrimination claims share the same requirements of proof and analytical framework as § 1983 claims, see Taylor v. On Tap Unlimited, Inc., 282 Fed. Appx. 801, 802 (11th Cir. 2008).  Because Plaintiff fails to meet her burden until Title VII, she likewise cannot establish a § 1983 claim.

unlawful for an employer to discriminate against an individual because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Plaintiff brought suit alleging both gender and racial discrimination. However, Plaintiff did not check the box for "race" or "national origin" in her EEOC Charge of Discrimination. Thus, Plaintiff cannot now assert a claim for racial discrimination in her Amended Complaint. See Gregory v. Ga. Dept. of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004)(explaining that "a plaintiff's civil complaint remains limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"). Thus, Plaintiff's claim for racial discrimination is dismissed.[6] The Court will now consider Plaintiff's claim of gender discrimination.

Disparate treatment claims, such as this one, require proof of discriminatory intent through either direct or circumstantial evidence. Denney v. City of Albany, 247 F.3d 1172, 1182-83 (11th Cir. 2001). When a plaintiff can only present circumstantial evidence of discrimination, a district court must utilize the McDonnell Douglas burden

---

[6] Even if Plaintiff had checked the box for racial or national origin discrimination on her EEOC Charge of Discrimination, Plaintiff does not address a claim for racial discrimination in her response to Defendant's Motion for Summary Judgment. Thus, dismissal would also be proper under Local Rule 7.5.

shifting framework to analyze the claim.  Weston-Brown v. Bank of Am. Corp., 167 Fed. Appx. 76, 79 (11th Cir. 2006); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

In McDonnell Douglas, the United States Supreme Court established "the allocation of the burden of production and the order for the presentation of proof" in discrimination cases.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 502 (1993).  The McDonnell Douglas framework encompasses both a prima facie case and a burden-shifting scheme.  This method of proof seeks to narrow a plaintiff's case to its most basic elements.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  The plaintiff must first establish a prima facie case of discrimination.  If the plaintiff establishes a prima facie case, a feather-weight burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action in question.  Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997).  If the defendant carries its burden, the plaintiff retains the burden of persuasion to show that the employer's proffered explanation was not the real reason for the employment change, but was instead a pretext for discrimination.  Tex. Dep't of Cmty. Affairs, 450 U.S. at 256.  The plaintiff, however, at all times carries the ultimate burden of proving by the preponderance of the

evidence that the challenged employment decision **was** motivated by discriminatory animus.  See id. at 252-53.

　　ii.　　*Plaintiff's Prima Facie Case*

　　In order to establish a prima facie case of discrimination under Title VII, Plaintiff must show: (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly-situated employees outside of her classification more favorably; and (4) she was qualified to do the job. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).   The parties do not dispute that Plaintiff belongs to a protected class, that she was subjected to an adverse employment action, and that she was qualified to do the job.[7]   Defendants assert, however, that Plaintiff is unable to demonstrate that any male firefighters were treated differently than she.

　　Plaintiff, however, alleges that Defendants failed to give her an opportunity to remove the Savannah Fire images before being disciplined, while similarly-situated male

---

[7] The Court notes that Defendants and Plaintiff define the "adverse employment action" in different terms.   Defendants define the adverse employment action as Plaintiff's termination.   Plaintiff, on the other hand, believes that the adverse employment action consists of "disciplinary action taken as a result of her personal and private activities concerning the posting of photographs and certain insignia on a private website . . . . a concerted effort to profile and terminate her employment." (Am. Compl. ¶ 16.)   Thus, the Court will consider the entirety of the disciplinary action taken against Plaintiff as the adverse employment action.

firefighters were given such an opportunity.  Specifically, Plaintiff points to General Order 07.012 which provided firefighters a grace period until March 7, 2007 to remove all unauthorized photographs. (Pl. Br. at 9.) Yet on March 2, 2007, Plaintiff was brought into a meeting with her superiors and given an Oral Reprimand for her use of the Savannah Fire photos.  Plaintiff submits the affidavit of Mike Dodd, a Savannah Fire firefighter, who testified that he knew of at least two male firefighters who have personal websites with Savannah Fire photographs.  (Mike Dodd Aff. ¶ 3.)

The Eleventh Circuit has explained that in order "to determine whether employees are similarly-situated for the purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  Holifield, 115 F.3d at 1562.  These employees must be "similarly situated in all relevant respects." Id. Furthermore, "[e]vidence that the other employees were guilty of similar misconduct but were not disciplined does not establish that an individual is similarly-situated when the party taking adverse action was unaware of the employees' misconduct." Shockley v. Healthsouth Central Ga. Rehabilitation Hosp., 293 Fed.

Appx. 742, 745 (11th Cir. 2008) (citing Jones v. Gerwens, 874 F.2d 1534, 1541-42 (11th Cir. 1989)).

Here, the Court will accept as true that other firefighters did have Savannah Fire photographs posted on their personal websites.  However, Plaintiff has failed to show that either Asst. Chief Bragg or Chief Middleton were aware that other male firefighters had such photographs on their websites at the time they chose to discipline Plaintiff.  Chief Middleton testified that "[he] did not know of any other Savannah Fire firefighter who was using Savannah Fire photos or images on their personal website when I met with Plaintiff on March 2, 2007." (Middleton Aff. ¶ 8.)  During that meeting on March 2, 2007, when Plaintiff suggested that she was being "singled out" because she was not the only firefighter with Savannah Fire photos on her personal website, Chief Middleton stated that he was unaware of any other such firefighters. (Pl. Dep. at 66.)  Chief Middleton asked Plaintiff specifically who she was talking about and Plaintiff refused to give him any names. Thus, even if Plaintiff is correct that other firefighters had similar photographs on their own websites, she has failed to demonstrate that Savannah Fire had any knowledge of these similarly-situated firefighters. Without

such knowledge, Plaintiff cannot establish the third prong of her prima facie case.

Further, Chief Middleton expressly stated that "General Order 07.012 was sent out after [he] became aware of [Plaintiff]'s website. It was intended to reinforce everyone's understanding of our existing Rules and Regulations which pertained to posting Savannah Fire photos and images on websites." Asst. Chief Bragg explains that General Order 07.012 was sent out to make clear that posting photographs of this type is "a violation of any policy regarding this type of issue – man, woman, doesn't make any difference . . . we didn't want any more complaints coming into the bureau about violations of policies." (Bragg Dep. at 36-37.) General Order 07.012 was not directed to any similarly-situated male firefighters, but as a general admonition to all employees of Savannah Fire. The fact that General Order 07.012 was sent out before Plaintiff's discipline and subsequent termination does not provide evidence that other male firefighters were treated differently than Plaintiff. Thus, Plaintiff has failed to establish a prima facie case of gender discrimination.

## B.   Title VII Retaliation Claim

The Court next addresses Plaintiff's retaliation claim, which was raised for the first time in her response to Defendant's Motion for Summary Judgment.   Plaintiff claims her termination was retaliation for complaining that she was being "singled out" in the March 2, 2007 meeting. However, while she mentioned retaliation in her EEOC charge, she did not plead a Title VII retaliation claim in the Amended Complaint.   The Amended Complaint contains claims for gender and race discrimination as well as a § 1983 First Amendment claim.   The word "retaliation" is noticeably absent.

In Grimsley v. Marshall of MA, Inc., 284 Fed. Appx. 604 (11th Cir. 2008), the court upheld the district court's grant of summary judgment on the plaintiff's ADA claim because the plaintiff did not properly plead the claim in his complaint.   Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement" of each claim showing that the plaintiff is entitled to relief.   The Grimsley court explained that "the point is to give the defendant fair notice of what the claim is and the grounds upon which it rests." Id. at 611 (quoting Davis v. Coca Cola Bottling Co. Consol., 516 F.3d 955, 974 (11th Cir. 2008)).

19

Likewise, in <u>Howard v. City of Robertsdale</u>, 168 Fed. Appx. 883, 887 n.2 (11th Cir. 2006), a plaintiff attempted to construe her case as a "tangible action" sexual harassment claim under Title VII in her response to the Defendant's motion for summary judgment. The Eleventh Circuit noted that "[w]hile her complaint pleads in detail a hostile work environment claim, it fails to offer even the slightest hint that she suffered tangible employment actions." (<u>Id.</u>)  Thus, the court construed her claim only as a Title VII hostile work environment claim, instead of a "tangible action" claim.

In the same way, Plaintiff has failed to offer even the "slightest hint" of a Title VII retaliation claim in her Amended Complaint. The Amended Complaint specifically states that "Plaintiff was selected for termination from employment by the Defendants based in part on her gender, female." (Am. Compl. ¶ 7.)  Plaintiff also states that she was "selected for termination by Defendants based in part on her race, African-American/Mixed Race." (<u>Id.</u> ¶ 8.) The term "retaliation" does not appear at all in this document.

Plaintiff's failure to make reference to a retaliation claim falls short of the requirements of Rule 8(a). Plaintiff's failure to plead a Title VII retaliation claim deprived Defendants of fair notice of Plaintiff's claim.

During Plaintiff's deposition, Defendants did not ask a single question about retaliation, though they discussed at length Plaintiff's comment that she thought she had been "singled out." In the Court's view, this omission demonstrates that Defendants would be prejudiced by allowing Plaintiff to now assert a claim for Title VII retaliation. Because Plaintiff did not plead such a claim in her Amended Complaint, this Court will not allow Plaintiff to improperly bring in such a claim in her response to Defendants' Motion for Summary Judgment.

### C.   § 1983 First Amendment Retaliation Claim

When a citizen enters government service, the citizen "must accept certain limitations on his or her freedom." Garcetti v. Ceballos, 547 U.S. 410, 419 (2006). When the government is acting as an employer, it is afforded broad discretion in its employment decisions. Boyce v. Andrew, 510 F.3d 1333, 1341 (11th Cir. 2007). Like private employers, government employers "need a significant degree of control over their employee's words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418. Thus, the Supreme Court has restricted the protections of the First Amendment afforded to government employees. Boyce, 510 F.3d at 1342.

The Supreme Court has made it clear, however, that a government employee does not relinquish First Amendment rights otherwise enjoyed by citizens simply because he or she is employed by the government. City of San Diego, Cal. v. Roe, 543 U.S. 77, 80 (2004). When government employees speak or write on their own time on topics unrelated to their employment, the speech is protected by the First Amendment, "absent some governmental justification . . . in regulating it." Id. (citing United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995)).

In order for a government employee such as Plaintiff to succeed on a First Amendment retaliation claim, she must demonstrate: "(1) that the speech can be fairly characterized as relating to a matter of public concern; 2) that her interests as a citizen outweigh the interests of the State as an employer; and (3) that the speech played a substantial or motivating role in the government's decision to take an adverse employment action." Akins v. Fulton County, Ga., 420 F.3d 1293, 1303 (11th Cir. 2005).[8] If the Plaintiff can establish these elements, Defendants may then

---

[8] In 2006, the Supreme Court clarified its previous holdings on First Amendment speech and explained that when government employees make statements pursuant to their official duties, "employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employee discipline." Garcetti v. Cellabos, 510 F.3d 1333, 1342 (2006). However, it is undisputed that Plaintiff's speech on her MySpace page was not made pursuant to her official duties. Thus, the Garcetti holding is inapplicable.

rebut the presumption of relation by proving that they would have made the same decision if the speech at issue had never taken place. Id.

        i.     Matter of Public Concern

     The Court must first determine whether Plaintiff spoke "as a citizen upon matters of public concern [or] as an employee upon matters only of personal interest." Connick v. Meyers, 461 U.S. 138, 147 (1983). While the Supreme Court acknowledges that the boundaries of the public concern test are not well-defined, see Roe, 543 U.S. at 83, the Court has provided district courts with some guidance. Specifically, Connick requires that this court examine the "content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 146-47, cited in Roe, 543 U.S. at 83. The Supreme Court has further explained that public concern is something that is "a subject of legitimate news interests; that is, a subject of general interest and of value and concern to the public at the time of publication." Roe, 543 U.S. at 83.[9]

---

[9]  For instance, in Pickering v. Board of Educ., 391 U.S. 563 (1968), the Supreme Court determined that a school teacher's letter to a local newspaper, which was critical of the manner of which the board of education had handled tax proposals, related to a matter of public concern. On the other hand, in Roe, 543 U.S. at 84, the Court found that a police officer's speech, a videotape of himself engaging in sexually explicit acts which he sold on E-Bay, did not relate to a matter of public concern.

Here, the speech at issue is the entirety of Plaintiff's MySpace page; both the unauthorized use of the Savannah Fire photos as well as her modeling photos. The Court agrees that the Savannah Fire photograph labeled "Diversity" has legitimate news interest. The diversity of Savannah Fire is something that is of value and concern to the public at the time of publication. Indeed, Captain Stanley all but admits this photo is of value and concern to the public. Stanley testifies that "we set out to take a photograph that would be used to publicize the fire department in recruiting to show diversity." (Stanley Dep. at 16.) Stanley states that the purpose of the photo was to "generate an image that reflected Savannah Fire Department. It reflected our diversity." (Id. at 17.)

While the Savannah Fire photograph may be of legitimate news interest, Plaintiff's modeling photos are not. Photographs of Plaintiff partially clothed captioned "Fresh Out of the Shower" and "I model too – this is from like my second shoot" are simply not of value and concern to the public.

However, the Eleventh Circuit has explained that "the fact that [the communicated] information may be of general interest to the public . . . does not alone make it of public concern for First Amendment purposes." Green v.

24

Barrett, 226 Fed. Appx. 883, 886 (11th Cir. 2007) (citing Morris v. Crow, 142 F.3d 1379, 1381 (11th Cir. 1998)). The Eleventh Circuit has instructed district courts to examine several factors to determine whether the speech touches on a matter of public concern: (1) whether the main thrust of the speech is essentially public in nature or private; (2) whether the speech was communicated to the public at large or privately to an individual; and (3) what the speaker's motivation in speaking was. Mitchell v. Hillsborough County, 468 F.3d 1276, 1283 (2006) (internal citations omitted).

The Eleventh Circuit has recognized that "because 'an employee's speech will rarely be entirely private or entirely public,' the 'main thrust' of the employee's speech must be determined." Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000) (quoting Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993)). This determination is made from examining the content, form, and context of a given statement as revealed by the whole record. Id. (citing Connick, 461 U.S. at 147-148).

By looking at the entirety of Plaintiff's MySpace page, the "main thrust" of Plaintiff's speech is private speech related solely to personal interests and does not touch on a matter of public concern. Plaintiff's MySpace

page is a reflection of her life.  For instance, along with her modeling and Savannah Fire photos, she had posted photos of her sister with her new baby, as well as various photos of her and her friends.

Second, Plaintiff's speech was not public.  The Court must consider whether the speech was "communicated to the public at large or privately to an individual."  Mitchell, 468 at 1283.  Plaintiff has submitted various affidavits that testify to the fact that her MySpace profile was set to Private so that only people she accepted as "friends" could view her profile.  (See Mollenkamp Aff. ¶¶ 5-6; Walden Aff. ¶ 3; Shelnutt Aff. ¶ 3.) This restricted speech to a select group of individuals is more akin to speech communicated "privately to an individual" rather than to the public at large.

Finally, the Court considers an employee's motive for speech.  The Eleventh Circuit has explained that "an employee's motive for speech, while not dispositive, is a factor that must be considered in determining whether speech is a matter of public concern."  Morris, 117 F.3d at 457.  Plaintiff's own testimony makes it clear that she had no motivation to convey a matter of public concern with her MySpace page.  Plaintiff states that she did not post any items to her MySpace account that she hoped a news

26

organization would pick up on and she did not feel they were a matter of public concern.  When asked why she posted the Savannah Fire pictures, Plaintiff explained "I am very proud of my job." (Pl. Dep. at 37.)  Plaintiff's own expressed motivation makes it clear that this speech does not touch on a matter of public concern.

    ii.      <u>Balancing of Interests</u>

Even if this Court were to determine that Plaintiff's speech related to a matter of public concern, her speech would still not be entitled to First Amendment protection. In <u>Pickering v. Board of Educ.</u>, 391 U.S. 563 (1968), the Supreme Court established the balancing test that weighs a "citizen's First Amendment interests, as a citizen, in commenting upon matter of public concern" against "the interests of the state, as an employer in promoting the efficiency of the public services it performs through its employees." <u>Anderson v. Burke Co.</u>, 239 F.3d 1216, 1220 (citing <u>Pickering v. Board of Educ.</u>, 391 U.S. 563 (1968)).

The Eleventh Circuit's decision in <u>Anderson</u> sheds light on Savannah Fire's interest in this case. In <u>Anderson</u>, the court recognized that a fire department has a "compelling and legitimate government interest" in ensuring that the public maintains confidence in the ability of the fire department to carry out its public safety mission.

239 F.3d at 1221-22.   The court further stated a fire department especially has a "need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from public employees." Id. at 1222 (quoting Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1991)).

The heart of the Pickering balancing test recognizes that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." Roe, 543 U.S. at 82 (citing Pickering, 391 U.S. at 572.   The Supreme Court has explained that if public employees were not able to speak on these matters, "the community would be deprived of informed opinions on important public issues.   The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." Id. (citing Pickering, 391 U.S. at 572).

In the instant case, Savannah Fire's interest in ensuring that the public maintain confidence in their department is a compelling one.   Indeed, Chief Middleton explained that "[a]t Savannah Fire, we work at having a positive image, and we want to be viewed as a professional,

28

competent department with outstanding members. We don't want to be viewed as the fire department with female firefighters wrapped in towels." (Middleton Aff. ¶ 3.) Indeed, the person who called Captain Stanley felt that Plaintiff's website conflicted with the image that Savannah Fire would want to portray. Furthermore, if other Savannah Fire employees were to view Plaintiff's MySpace page, the display of provocative photos next to photos of Savannah Fire employees may damage the "mutual respect" among Savannah Fire's ranks that is crucial to such paramilitary organizations.

Plaintiff's interest in disseminating these captioned photographs on her MySpace page simply cannot outweigh the government's interest in protecting its public image. Plaintiff is not offering an informed opinion on important public issues; her only comment is the "Diversity" caption on the Savannah Fire photo. To prohibit her from posting this captioned picture simply does not deprive the community of her "informed opinion on important policy issues." Further, because this statement is restricted to a select group of Plaintiff's friends, the public's interest in receiving this information is relatively low.

Because this Court has determined that Plaintiff's speech does not touch a matter of public concern and fails

the Pickering balancing test, her speech is not afforded First Amendment protection. Thus, this Court need not determine whether Savannah Fire retaliated against her for her speech. See Anderson v. Burke County, Ga., 239 F.3d 1216, 1219-20 (11th Cir. 2001).

## IV.  CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (doc. no. 32) is **GRANTED**. Plaintiff's Motion for a hearing (doc. no. 43) is **DENIED AS MOOT**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants. The Clerk shall terminate all deadlines and motions and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this _____ day of June, 2009.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA